## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| In re: | ) | Case No. 09-22621 HRT |
| | ) | |
| ARCHANGEL DIAMOND CORPORATION, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## DISCLOSURE STATEMENT FOR DEBTOR'S AMENDED PLAN OF LIQUIDATION DATED NOVEMBER 4, 2009

### INTRODUCTION

Archangel Diamond Corporation, as debtor and debtor-in-possession ("Debtor"), filed an amended plan of liquidation (the "Plan," attached hereto as <u>Exhibit 1</u>) with the United States Bankruptcy Court for the District of Colorado on November 4, 2009. Pursuant to the terms of the United States Bankruptcy Code, this Disclosure Statement (hereinafter the "Disclosure Statement") has been presented to and approved by the Bankruptcy Court. Approval of the Bankruptcy Court is required by statute but does not constitute a judgment by the Court as to the desirability of the Plan or as to the value or suitability of any consideration offered under the Plan.

Debtor prepared the Disclosure Statement to solicit votes for the confirmation of the Plan and to provide information sufficient to permit a creditor to make a reasonably informed decision in exercising the right to vote upon the Plan. The material herein presented is intended solely for that purpose and solely for the use of known creditors of Debtor, and, accordingly, may not be relied upon for any purpose other than determination of how to vote on the Plan. Unless otherwise indicated, all capitalized terms used herein contain the meaning ascribed to them in the Plan.

*VOTING*: **IN ORDER TO VOTE ON A PLAN, A HOLDER ASSERTING A CLASS 1 OR 2 CLAIM AGAINST DEBTOR OR A HOLDER OF AN EQUITY INTEREST MUST HAVE FILED A PROOF OF CLAIM OR INTEREST AT OR PRIOR TO THE BAR DATE, UNLESS SUCH CREDITOR HAS BEEN SCHEDULED BY THE DEBTOR AS HAVING A CLAIM OR EQUITY INTEREST WHICH IS UNDISPUTED, LIQUIDATED, AND NOT CONTINGENT. ANY CREDITOR HAVING A CLAIM OR EQUITY INTEREST WHICH IS SCHEDULED AS UNDISPUTED, LIQUIDATED, AND NOT CONTINGENT IS, TO THE EXTENT SCHEDULED, DEEMED TO HAVE FILED A CLAIM OR EQUITY INTEREST, AND, ABSENT OBJECTION, SUCH CLAIM OR EQUITY INTEREST IS DEEMED ALLOWED. YOU ARE ADVISED TO REFER TO THE SCHEDULES ON FILE WITH THE CLERK OF THE BANKRUPTCY COURT TO DETERMINE THE EXTENT TO WHICH YOUR CLAIM OR EQUITY INTEREST IS SCHEDULED AND IF IT IS DISPUTED, UNLIQUIDATED, OR CONTINGENT. A HOLDER OF A CLASS 1 OR 2 CLAIM OR A HOLDER OF AN EQUITY INTEREST MAY VOTE TO ACCEPT OR REJECT THE PLAN BY FILLING OUT AND MAILING**

**THE BALLOT WHICH IS ENCLOSED WITH THE DISCLOSURE STATEMENT TO: BALLARD SPAHR LLP, 1225 17TH STREET, SUITE 2300, DENVER, COLORADO 80202, ATTENTION: JAMES P. BICKFORD.**

<u>**DEBTOR ENCOURAGES YOU TO VOTE TO ACCEPT THE PLAN.**</u>

The Court has fixed as the last date by which ballots must be delivered to Ballard Spahr LLP, as December 3, 2009. No vote received after such time will be counted. Whether a creditor or holder of an equity interest votes on a plan or not, such person will be bound by the terms and treatment set forth in the applicable plan if said plan is accepted by the requisite majorities of creditors or equity holders and/or is confirmed by the Court. Absent some affirmative act constituting a vote, such creditor or equity holder will not be included in the tally. Allowance of a claim or interest for voting purposes does not necessarily mean that all or a portion of the claim or interest will ultimately be Allowed or Disallowed for distribution purposes.

In order for a plan to be accepted by creditors, a majority in number and two-thirds in amount of claims filed or deemed allowed of each class of creditors entitled to vote on the plan must vote to accept the plan. In order for a plan to be accepted by equity holders, two-thirds in amount of allowed equity interests must vote to accept the plan. For purposes of determining whether the requisite majorities are achieved, the computation will be based upon the total number of claims or interests actually voting rather than on the total number of claims approved and allowed. You are, therefore, urged to fill in, date, sign, and promptly mail the enclosed ballot. Please be sure to properly complete the form and legibly identify the name of the claimant.

# TABLE OF CONTENTS

**Page**

ARTICLE I PRELIMINARY STATEMENT ................................................................. 1
ARTICLE II INTRODUCTORY NARRATIVE ............................................................ 1
    1.    Nature of the Plan ............................................................................. 1
    2.    Classes ............................................................................................. 1
    3.    Treatment of Convenience Claims (Class 1) .................................... 1
    4.    Treatment of General Unsecured Claims (Class 2) .......................... 2
    5.    Treatment of Equity Interests (Class 3) ........................................... 2
    6.    Non-Consensual Confirmation ......................................................... 2
ARTICLE III DISCLAIMERS ...................................................................................... 2
ARTICLE IV SOLICITATION AND VOTING ............................................................ 3
    1.    Purpose of the Disclosure Statement ............................................... 3
    2.    Solicitation Package ......................................................................... 4
    3.    General Voting Procedures and Voting Deadline .............................. 4
    4.    The Confirmation Hearing ............................................................... 5
    5.    Requirements for Confirmation ........................................................ 5
    6.    Date Set for Filing Objections to Confirmation ............................... 5
    7.    Acceptances Necessary To Confirm Plan ........................................ 5
    8.    Confirmation of the Plan If an Impaired Class Does Not Accept ...... 6
    9.    Best Interest of Creditors and Comparison with Chapter 7 Liquidation. .............. 7
ARTICLE V BACKGROUND & DEBTOR'S HISTORY ............................................. 7
    1.    Debtor and Its Corporate Relationships ........................................... 7
    2.    Debtor's Business ............................................................................ 7
    3.    Events Leading Up to Involuntary Petition. ..................................... 8
    4.    Debtor's Activities Since the Petition Date ..................................... 10
    5.    Debtor's Chapter 11 Case ............................................................... 10
ARTICLE VI THE PLAN .............................................................................................. 10
    1.    Classes of Claims and Interests. ...................................................... 11
    2.    Treatment of Claims and Interests ................................................... 11
    3.    Analysis of Projected Recovery ...................................................... 12
ARTICLE VII MEANS OF IMPLEMENTING THE PLAN ........................................ 12
    1.    Summary ......................................................................................... 12
    2.    Plan Funding ................................................................................... 12
    3.    DIP Facility Claims ......................................................................... 13
    4.    Discontinued Corporate Existence ................................................... 13
    5.    Formation of Liquidating Trust ....................................................... 13
    6.    Post-Effective Date Operations and Management ............................. 13
    7.    Payment of the Liquidating Trustee ................................................. 14
ARTICLE VIII TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES ......................................................................................................................... 14
    1.    Summary ......................................................................................... 14
    2.    Assumption of Executory Contracts and Unexpired Leases ............. 14
    3.    Assignment of Executory Contracts and Unexpired Leases ............. 14

| | | |
|---|---|---|
| 4. | Cure Rights for Executory Contracts and Unexpired Leases Assumed Under the Plan | 15 |
| 5. | Rejection Damages Bar Date for Rejections Pursuant to the Plan | 15 |
| 6. | Assumption of Executory Contracts and Unexpired Leases | 15 |
| 7. | Treatment of Claims Arising from Assumption or Rejection | 15 |

**ARTICLE IX PROVISIONS GOVERNING DISTRIBUTIONS** .................................... 16

| | | |
|---|---|---|
| 1. | Summary | 16 |
| 2. | Distributions for Allowed General Unsecured Claims and Allowed Equity Interests | 16 |
| 3. | Distributions for Allowed Convenience Claims | 16 |
| 4. | Interest on Claims | 16 |
| 5. | Distribution by Liquidating Trust | 16 |
| 6. | Means of Cash Payment | 16 |
| 7. | Delivery of Distributions | 17 |
| 8. | De Minimis Distributions | 17 |
| 9. | Fractional Distributions | 17 |
| 10. | Withholdings, Payment, and Reporting Requirements | 17 |
| 11. | No Distribution in Excess of Allowed Amounts | 18 |
| 12. | Allocation of Distributions | 18 |
| 13. | Tax Considerations | 18 |

**ARTICLE X PROCEDURES FOR RESOLVING DISPUTED CLAIMS** ...................... 18

| | | |
|---|---|---|
| 1. | Summary | 18 |
| 2. | Prosecution of Objections to Claims | 18 |
| 3. | Treatment of Disputed Claims | 19 |
| 4. | Provisions for Disputed Claims | 19 |
| 5. | Accounts; Escrows; Reserves | 19 |

**ARTICLE XI CONDITIONS PRECEDENT** ............................................................. 20

| | | |
|---|---|---|
| 1. | Summary | 20 |
| 2. | Conditions Precedent to the Confirmation Date | 20 |
| 3. | Conditions Precedent to the Effective Date | 21 |

**ARTICLE XII RETENTION OF JURISDICTION** ..................................................... 22

| | | |
|---|---|---|
| 1. | Summary | 22 |
| 2. | Scope of Retention of Jurisdiction | 22 |
| 3. | Failure of Bankruptcy Court to Exercise Jurisdiction | 24 |

**ARTICLE XIII CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES** ........ 24

**ARTICLE XIV MISCELLANEOUS PROVISIONS** ..................................................... 25

| | | |
|---|---|---|
| 1. | Administrative Claims | 25 |
| 2. | Professional Fee Claims | 25 |
| 3. | Payment of Statutory Fees; Filing of Quarterly Reports | 26 |
| 4. | Modifications and Amendments | 26 |
| 5. | Releases and Related Matters. | 28 |
| 6. | Injunction. | 30 |
| 7. | Exculpation and Limitation of Liability | 31 |
| 8. | Term of Injunction or Stays | 31 |
| 9. | Revocation, Withdrawal, or Non-Consummation | 31 |
| 10. | Notices | 32 |

11.   Governing Law ................................................................................ 32

12.   Additional Information ..................................................................... 33

13.   Exhibits ........................................................................................... 33

# ARTICLE I
## PRELIMINARY STATEMENT

The Plan is a straightforward plan that deals adequately and fairly with Holders of Claims and Equity Interests.  Confirmation of the proposed Plan will result in the creation of a Liquidating Trust to oversee and pursue Debtor's sole asset of significant value, the Colorado Litigation.  The Liquidating Trust, after the Resolution of the Colorado Litigation, will distribute the proceeds thereof to pay the Preservation Costs, the Allowed Convenience Claims, the Allowed General Unsecured Claims with interest, and, if a balance remains, the Allowed Equity Interests, in accordance with the procedures set forth in the Plan.

Prior to the date the Chapter 11 Case was converted from a chapter 7 proceeding, Debtor and the Lock-Up Support Parties entered into the Lock-Up Agreement, a copy of which is attached as Exhibit B to the Plan, to help ensure protection of the Colorado Litigation through the confirmation of the Plan and the operation of the Liquidating Trust contemplated thereby.  Upon the Resolution of the Colorado Litigation, Distributions will be made by the Liquidating Trust according to the provisions of the Plan.

# ARTICLE II
## INTRODUCTORY NARRATIVE

1. <u>Nature of the Plan</u>.  The Plan constitutes a chapter 11 plan of liquidation for Debtor.  All monies will be distributed to the appropriate recipients pursuant to the Plan and the priorities outlined in the Bankruptcy Code.

2. <u>Classes</u>.  There are only three Classes contemplated by the Plan: General Unsecured Claims, Convenience Claims, and Equity Interests.  Their names, number of members, composition, and dollar amount are as follows:

| Class | Claim | Number of Members | Composition | Dollar Amount |
|---|---|---|---|---|
| 1 | Convenience Claims | Unknown | Allowed unsecured claims of all sources and less than $1000.00 arising prior to the Petition Date | Approximately $2,000 |
| 2 | General Unsecured Claims | Unknown | Allowed unsecured claims of all sources and greater than $1000.00 arising prior to the Petition Date | Approximately $13,000,000 |
| 3 | Equity Interests | Unknown | Allowed Equity Interests as defined in the Plan | Undetermined |

3. <u>Treatment of Convenience Claims (Class 1)</u>.  On, or as soon as practicable after, the Effective Date, the Liquidating Trust shall pay, from the Exit Financing, a total of 95% of the amount Allowed to each Holder of an Allowed Convenience Claim, in full satisfaction of such

Allowed Convenience Claim, up to a $3,000.00 cap, and to the extent the Class 1 Claims exceed $3,000.00 in the aggregate, Holders of Allowed Convenience Claims will be paid their Ratable Proportion, *pari passu*, with other Holders of Allowed Convenience Claims, with the excess amounts up to 95% receiving treatment as Class 2 General Unsecured Claims.

    4.    <u>Treatment of General Unsecured Claims (Class 2)</u>.  Holders of Allowed General Unsecured Claims will receive Class A shares in the Liquidating Trust, as defined in the Liquidating Trust Documents, in full satisfaction of their Allowed General Unsecured Claims and according to their Ratable Proportion, and, upon the Resolution of the Colorado Litigation, holders of Class A shares will be paid, *pari passu* with other holders of Class A shares, from the Liquidating Trust Assets.  If the Liquidating Trust Assets are sufficient to pay holders of Class A shares in full and Class 2 has voted to accept the Plan by the statutory majorities set forth in section 1126 of the Bankruptcy Code, then each holder of Class A shares shall be also entitled to post-petition Interest on its Allowed General Unsecured Claim from the Petition Date through the Distribution Date.

    5.    <u>Treatment of Equity Interests (Class 3)</u>.  Holders of Allowed Equity Interests will receive Class B shares in the Liquidating Trust, as defined in the Liquidating Trust Documents, in satisfaction of their Allowed Equity Interests and according to their Ratable Proportion, and, upon the Resolution of the Colorado Litigation, holders of Class B shares will be paid, *pari passu* with other holders of Class B shares from the remaining Liquidating Trust Assets, after the holders of Class A shares are paid in full with Interest on their Allowed General Unsecured Claims.  With regard to Distributions to Equity Interests, the Liquidating Trust will make a Distribution to Goldbase Capital Limited (BVI) ("Goldbase") in an amount equal to ten percent (10%) of the recovery due to Holders of Equity Interests eligible to receive a Distribution under the Plan pursuant to an assignment of rights executed by Goldbase in favor of Debtor, which assignment will be implemented through the operation of the Plan and the Liquidating Trust Documents.

    6.    <u>Non-Consensual Confirmation</u>.  Debtor reserves the right to seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code.  To the extent that any Class votes to reject the Plan, Debtor further reserves the right to modify the Plan in accordance with Article IV.8 below.

**ARTICLE III**
**DISCLAIMERS**

    1.    The Disclosure Statement may not be relied on for any purpose other than to determine how to vote on the Plan.  Any estimate of recovery contained herein shall not constitute an admission of any fact or liability by any party.

    2.    The statements contained in the Disclosure Statement are made as of the date of the order approving the Disclosure Statement unless another time is specified herein, and neither delivery of the Disclosure Statement nor any exchange of rights made in connection with the Disclosure Statement shall, under any circumstance, create an implication that there has not been a change in the facts set forth herein since the date the Disclosure Statement was compiled.

3.      No representations concerning the Plan are authorized by Debtor other than as set forth in the Disclosure Statement.  Debtor does not warrant or represent that the information contained herein is without any inaccuracy.

4.      The presentation of the information set forth herein does not constitute legal admissions by Debtor.  Certain of the information, by its nature, is forward-looking, contains estimates and assumptions which may prove to be false or inaccurate, and contains projections that may be materially different from actual future results.  Such estimates and assumptions are made for informational purposes only and no representation or warranty is made with respect thereto.  Debtor does not know of any false statements contained in the Disclosure Statement.

5.      Any estimates of Claims, Equity Interests, or their recoveries set forth in the Disclosure Statement may vary from the final amounts of Claims and Equity Interests Allowed by the Bankruptcy Court.

6.      Debtor anticipates that the proceeds, if any, from the Colorado Litigation will be the primary source of recoveries for Holders of Allowed General Unsecured Claims and Allowed Equity Interests.  Debtor cannot fairly and accurately predict the outcome of the Colorado Litigation.  Consequently, Debtor cannot fairly and accurately project what recovery, if any, may be realized by Holders of Allowed General Unsecured Claims and Allowed Equity Interests.

7.      The prosecution of the Colorado Litigation is contingent on the provision of Exit Financing, and such financing may be terminated in accordance with the Exit Facility which will be entered into on terms substantially in conformance with the Exit Facility Term Sheet attached as Exhibit C to the Plan.

8.      DISTRIBUTIONS UNDER THE PLAN AND TRANSFER OF ASSETS OF DEBTOR MAY HAVE TAX CONSEQUENCES TO HOLDERS OF CLASS 1 AND CLASS 2 CLAIMS AND HOLDERS OF CLASS 3 EQUITY INTERESTS.  HOLDERS OF CLASS 1 AND CLASS 2 CLAIMS AND HOLDERS OF CLASS 3 EQUITY INTERESTS ARE URGED TO CONSULT WITH THEIR TAX ADVISORS REGARDING SUCH CONSEQUENCES.

## ARTICLE IV
## SOLICITATION AND VOTING

1.      <u>Purpose of the Disclosure Statement</u>.  The purpose of the Disclosure Statement is to provide Holders of Class 1 and Class 2 Claims and Holders of Equity Interests with adequate information about Debtor and the Plan so as to permit them to make informed judgments when voting to accept or reject the Plan.  The US Trustee and Lukoil filed objections to the adequacy of the Disclosure Statement.  By the provisions of this amended Disclosure Statement, the objections of the US Trustee and Lukoil have been resolved.  The Disclosure Statement and its Exhibits have been approved by order of the Bankruptcy Court dated November __, 2009, as containing, in accordance with the provisions of the Bankruptcy Code, adequate information of a kind and in sufficient detail that would enable a reasonable, hypothetical investor, typical of a holder of impaired claims or interests that is entitled to vote on the Plan, to make an informed judgment with respect to the acceptance or rejection of the Plan.  The Bankruptcy Court's

approval of the Disclosure Statement, however, does not constitute a recommendation by the Bankruptcy Court either for or against the Plan.

The Disclosure Statement is being transmitted to Holders of Class 1 Convenience Claims, Class 2 General Unsecured Claims, and Class 3 Equity Interests for the purpose of soliciting votes to accept or reject the Plan.

2.      Solicitation Package.  Accompanying the Disclosure Statement are, among other things, copies of (a) the Plan; (b) the order approving the Disclosure Statement (attached hereto as Exhibit 2), which, among other things, provides notice of the time for submitting Ballots to accept or reject the Plan, the date, time and place of the Confirmation Hearing and related matters, and the time for filing objections to confirmation of the Plan; (c) a copy of Debtor's most recent Monthly Operating Report Filed with the Bankruptcy Court (attached hereto as Exhibit 3); (d) a list of scheduled creditors expected to comprise Class 1 Convenience Claims (attached hereto as Exhibit 4); (e) a list of scheduled creditors expected to comprise Class 2 General Unsecured Claims (attached hereto as Exhibit 5); and (f) one or more Ballots (and a return envelope), to be used by you, if you are entitled to vote, in order to vote to accept or reject the Plan.  Each member of a voting Class will be asked to vote for acceptance or rejection of the Plan.

3.      General Voting Procedures and Voting Deadline.

Accompanying the Disclosure Statement are appropriate Ballots for acceptance or rejection of the Plan.  Only a party entitled to vote on the Plan may cast a Ballot.  Debtor has the right to review and challenge any Ballot submitted for an amount that differs from Debtor's records.

After carefully reviewing the Plan, the Disclosure Statement, and (if you are entitled to vote) the detailed instructions accompanying your Ballot, please indicate your acceptance or rejection of the Plan by checking the appropriate box on the enclosed Ballot. Please complete and sign your original Ballot and return it in the envelope provided.  You must provide all of the information requested by the appropriate Ballot.  Failure to do so may result in the disqualification of your vote on such Ballot.  Any Ballot that is executed but does not indicate an acceptance or rejection of the Plan will be deemed to be an acceptance of the Plan.

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT, MAILED TO THE ADDRESS SET FORTH ABOVE, AND ACTUALLY RECEIVED NO LATER THAN DECEMBER 3, 2009 AT 5 p.m. (MOUNTAIN) BY:**

**JAMES P. BICKFORD of**
**BALLARD SPAHR LLP**

**BALLOTS RECEIVED AFTER SUCH TIME WILL NOT BE COUNTED UNLESS THE BANKRUPTCY COURT SO ORDERS.**

**WHILE YOU ARE ENTITLED TO VOTE TO REJECT THE PLAN, DEBTOR RECOMMENDS AND REQUESTS THAT YOU VOTE "FOR ACCEPTANCE".**

    4.    The Confirmation Hearing. The Bankruptcy Court has scheduled a hearing on the confirmation of the Plan to commence on December 11, 2009, at 9:00 a.m. (Mountain), or as soon thereafter as the parties can be heard. The Confirmation Hearing will be held in the United States Bankruptcy Courthouse, Courtroom B, 721 19th St, Denver, Colorado 80202. At the Confirmation Hearing, the Bankruptcy Court will consider whether the Plan satisfies the various requirements of the Bankruptcy Code in order for it to be confirmed. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the hearing or at any subsequently adjourned hearing.

    5.    Requirements for Confirmation. In order for the Plan to be confirmed, the Bankruptcy Code requires the Bankruptcy Court to determine that the Plan complies with the requirements set forth in section 1129(a) of the Bankruptcy Code. These are detailed legal requirements concerning which you should consult your legal advisors. Debtor believes that all such requirements will be satisfied prior to the Confirmation Hearing.

    6.    Date Set for Filing Objections to Confirmation. The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed with the Clerk of the Bankruptcy Court and served so that they are actually received on or before **December 3, 2009, at 5 p.m. (Mountain)** by Debtor's counsel and the Office of the United States Trustee, at the following addresses:

> Debtor's Counsel:
> BALLARD SPAHR LLP
> Carl A. Eklund, Esq.
> James P. Bickford, Esq.
> 1225 17th Street
> Suite 2300
> Denver, Colorado 80202
> (303) 292-2400
>
> Counsel for United States Trustee:
> Alison E. Goldenberg
> 999 18th St
> Suite 1551
> Denver, Colorado 80202

    The failure of any person to File and serve timely objections may preclude such person from objecting to confirmation of the Plan.

    7.    Acceptances Necessary To Confirm Plan. Holders of Claims in Class 1 and Class 2 and Holders of Equity Interests are entitled to vote on the Plan. All Claims in Class 1, Class 2, and Class 3 are Impaired. A Holder of a Claim in Class 1 and Class 2 and a Holder of an Equity Interest is entitled to vote to accept or reject the Plan if (i) its Claim has been scheduled by

Debtor, and such Claim is not scheduled as disputed, contingent or unliquidated; or (ii) it has filed a Proof of Claim on or before the Bar Date, and an objection has not been filed to such Proof of Claim.

Voting acceptance by an Impaired Class is a necessary, but not sufficient, condition for confirmation of the Plan. Section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in amount and more than one half in number of the claims in that class that actually vote. For the purpose of determining the dollar amount and the number of claims accepting a plan, only those who are entitled to vote and actually vote to accept or reject the plan are counted. Section 1126 of the Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by holders of at least two-thirds in amount of the outstanding equity interests in that class that actually vote. For the purpose of determining the amount of equity interests accepting a plan, only those who are entitled to vote and actually vote to accept or reject the plan are counted.

Unless there is acceptance of the Plan by all members of an Impaired Class, the Bankruptcy Court must also determine that under the Plan, Class members will receive property of a value, as of the Effective Date of the Plan, that is not less than the amount that such Class members would receive or retain if Debtor were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date of the Plan. This is the "best interests of creditors" test which Debtor believes the Plan satisfies and which is discussed in Article IV.9, below.

8.     Confirmation of the Plan If an Impaired Class Does Not Accept.

If the requisite number of votes in favor of the Plan is not obtained so that either Class 1 or Class 2, but not both, has not accepted the Plan, Debtor may use the "cram down" provision of section 1129(b) of the Bankruptcy Code to confirm the Plan as described below.

Section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes. The Bankruptcy Court may confirm a plan at the request of a plan proponent if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

A plan is fair and equitable as to a class of unsecured claims that rejects a plan if the plan provides (a) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim, or (b) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of equity interests that rejects a plan if the plan provides (a) that each holder of an interest included in the rejecting class receive or retain on account of that interest property that has a value, as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, and fixed redemption price to which such holder is entitled, or the value of such interest,

or (b) that the holder of any interest that is junior to the interest of such class will not receive or retain under the plan on account of such junior interest any property at all.

        9.      <u>Best Interest of Creditors and Comparison with Chapter 7 Liquidation.</u>

      Even if the Plan is accepted by Class 1, Class 2, and Class 3, the Bankruptcy Code requires the Court to find either that all members of the Impaired Class have accepted the Plan or that the Plan will provide the Class 1 or Class 2 members that have not accepted the Plan with a recovery that has value at least equal to the value of the recovery that such member would receive if Debtor were liquidated under chapter 7 of Bankruptcy Code as of the Effective Date of the Plan. This is the "best interests of creditors" test.

      The transfer of Debtor's Assets to the Liquidating Trust will result in a greater recovery to creditors and equity holders than a chapter 7 liquidation. The Liquidating Trust will oversee the Colorado Litigation and distribute the Liquidating Trust Assets to Holders of Claims and Equity Interests in accordance with the Plan. Because a chapter 7 liquidation requires the appointment of a trustee in bankruptcy, conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code would likely delay the orderly liquidation of the Assets. A unitary Liquidating Trustee will limit delay associated with multiple levels of decision-making and negotiation with the U.S. Trustee. Moreover, conversion would result in the Estate incurring substantial additional expense, including compensation for an additional trustee (which could approach 3% of the amounts distributed, see 11 U.S.C. § 326), and would most likely result in lower recoveries to Holders of Allowed Claims and Allowed Equity Interests.

      In addition, under a chapter 7 liquidation, the Colorado Litigation would likely be terminated. Firebird has committed to provide Exit Financing in the amount of at least $1,250,000. Firebird would not commit to fund the Colorado Litigation in the event of a chapter 7 liquidation. Thus, under a chapter 7 liquidation, Debtor's major Asset would be completely stripped of its value as there would be no resources to pursue the Colorado Litigation, and creditors would likely recover dramatically less than they otherwise might under the Plan, if at all, and Holders of Equity Interests would likely not recover at all.

      Accordingly, because the Plan (i) avoids payment of fees to a chapter 7 trustee as required by section 326(a) of the Bankruptcy Code; (ii) provides for Exit Financing to fund and protect the Colorado Litigation as well as operate the Liquidating Trust; and (iii) expedites Distributions in accordance with the order of priorities under the Bankruptcy Code, Debtor believes that the "best interests of creditors" test will be satisfied under the Plan.

**ARTICLE V**
**BACKGROUND & DEBTOR'S HISTORY**

        1.      <u>Debtor and Its Corporate Relationships.</u> Debtor is the 100% owner of its Affiliates and owns 40% of the common equity of Almazny Bereg, a Russian joint venture company. Pursuant to a settlement embodied in the Plan, Debtor's interest in Almazny Bereg will increase to 50%.

        2.      <u>Debtor's Business.</u> Debtor's primary business was to develop diamond mines and engage in diamond exploration. Debtor is not currently operating. Debtor's primary place of

business is in Toronto, Ontario, Canada. Debtor is licensed to do business in the State of Colorado and is currently in good standing with the State of Colorado.

3.      Events Leading Up to Involuntary Petition.

Debtor supported its diamond exploration by engaging in joint ventures in an attempt to develop diamond mines in novel locations.

In 1993, Debtor entered into an agreement (the "1993 Agreement") to participate in a joint venture to develop the Verkhotina Field in northwest Russia with a Russian state corporation, the successor-in-interest to which is Arkhangelskgeoldobycha ("AGD"), a subsidiary of Lukoil ("Lukoil"). The joint venture company formed for these purposes is named Almazny Bereg. Under the 1993 Agreement and a 1994 memorandum, AGD was to obtain a state-issued license to develop the Verkhotina Field (the "License") and subsequently transfer the License to Almazny Bereg. Debtor invested over $30 million in Almazny Bereg.

In 1996, Debtor and AGD discovered the Grib Pipe, a potentially economic, diamondiferous kimberlite orebody in the Verkhotina license area. AGD, however, never transferred the License to Almazny Bereg, and fraudulently induced Debtor to continue to provide funding for the development of the Verkhotina Field.

On November 27, 2001, Debtor filed an action (the "Colorado Litigation"), captioned 01CV6514, in the District Court for the 2nd Judicial District, City and County of Denver, Colorado alleging fraud, aiding and abetting fraud, breach of contract, intentional interference with contract, breach of fiduciary duty, inducing breach of fiduciary duty, unjust enrichment, and civil conspiracy. The Colorado Litigation seeks compensatory damages in excess of $400 million with relation to the Grib Pipe. AGD was dismissed from the Colorado Litigation for lack of personal jurisdiction, but the claims against Lukoil remain active in the Colorado District Court. Lukoil's motion to dismiss for lack of personal jurisdiction is pending. To this point, Debtor has incurred significant legal fees which have stressed Debtor and limited its ability to operate its business. Debtor is also a party to an arbitration proceeding in Stockholm, Sweden captioned UNCITRAL Arbitration (074/2006). Debtor has incurred significant legal fees in both proceedings.

In recent years Debtor has been dependent for financial support on De Beers, S.A. ("De Beers"), and Cencan, S.A. ("Cencan"). On October 31, 2007, Debtor entered into that certain Term Credit Facility in favor of Archangel Diamond Corporation (as amended, the "Credit Facility") between Cencan, a wholly-owned subsidiary of De Beers, as Lender, and Debtor, as Borrower, in the maximum amount of $4,500,000, and as varied by agreement dated July 22, 2008 to $8,800,000, plus accrued interest thereon. Amounts borrowed under the Credit Facility bear interest at a rate equal to the annual LIBOR rate plus 275 basis points. As of the Petition Date, Debtor had fully drawn the $8,800,000.00 Credit Facility. On April 30, 2009, Debtor defaulted on its obligations under the Credit Facility.

Additionally, on April 15, 2008, Debtor entered into that certain Term Loan Agreement (the "Term Loan") between De Beers, as Lender, and Debtor, as Borrower, in the amount of $115,000,000 which accrued interest at the aforementioned rate. Amounts borrowed or due

under the Term Loan would have borne interest at the annual LIBOR rate plus 3.5% per annum through July 1, 2008. While Debtor did not borrow any funds under the Term Loan, Debtor was nonetheless obligated to pay a 1% financing fee of $1,150,000 plus interest thereon. On July 1, 2008, Debtor defaulted on its obligation to pay the financing fee plus accrued interest thereon due under the Term Loan and thereafter such obligations began accruing interest at the default rate of the annual LIBOR rate plus 5.5% per annum.

In 2006, ADC began a protracted dialogue with Lukoil in an attempt to settle the dispute and move the Verkhotina project forward in partnership. The dialogue resulted in the signing of an agreement (the "Settlement Agreement") in Moscow in April 2008, under which Debtor was to acquire 49.99% of AGD for a total consideration of $225 million, payable in three installments.

The Settlement Agreement was never completed and was terminated in January 2009 in accordance with its terms. By this time Debtor had exhausted its funds and had to return to the market to raise new funding to continue to pursue its claims against Lukoil and AGD. Debtor has only two ongoing proceedings or potential litigation claims: the Colorado Litigation and the arbitration in Stockholm, Sweden.

At the beginning of 2009, both Cencan and Firebird, the company's second largest shareholder, indicated their willingness to provide further funding for Debtor's operations on certain terms. In March 2009, Debtor, Firebird, and Cencan signed a non-binding term sheet for a $6 million (Canadian) financing. The financing, however, never progressed beyond the term sheet stage.

In April 2009, Cencan and Firebird each provided Debtor with a €75,000 unsecured loan. The proceeds of these loans were utilized to fund the expenses of prosecuting the arbitration proceeding in Stockholm, Sweden, and are currently being held in an escrow account maintained by Banca Nazionale Del Lavoro, in Rome, Italy. These loans accrued interest at the LIBOR rate plus 8.5% per annum. Upon a final disposition of the arbitration, the remaining proceeds, net of unreimbursed expenses, will be returned to Debtor's Estate.

By the beginning of May 2009, Debtor was insolvent and unable to service its loans or make payments to outstanding third party creditors. As a result Cencan proposed to Debtor that Cencan would finance a process under the Canadian Bankruptcy and Insolvency Act whereby Cencan would finance a partial settlement for Debtor's creditors (including full settlement of Debtor's debts to De Beers and Cencan) in return for acquiring all of Debtor's outstanding shares (the "BIA Proposal"). However, Debtor did not immediately accept the BIA Proposal, and before Debtor had decided to accept it, the BIA Proposal was curtailed by the filing of the chapter 7 involuntary petition discussed below.

In May 2009, Debtor was approached by a potential investor (the "Potential Investor"), which offered, subject to due diligence, to pay all of Debtor's debts and acquire approximately 90% of Debtor by means of a private placement. The Potential Investor was required to pay a non-refundable deposit of $250,000 to conduct its due diligence, and Cencan delayed the BIA Proposal. After conducting its due diligence, the Potential Investor chose not to proceed with the

private placement and the BIA Proposal process resumed. Debtor has applied the funds from the non-refundable deposit to its operations and has since nearly exhausted the funds.

On June 26, 2009, a consortium of three creditors, MS, Firebird, and Hartz filed a chapter 7 involuntary petition in the United States Bankruptcy Court for the District of Colorado.

Following the filing of the chapter 7 involuntary petition, Debtor, MS, Firebird, Hartz, Cencan and the De Beers Entities, Debtor's principal stakeholders, began discussing the terms of a consensual chapter 11 liquidation. The Lock-Up Agreement executed by the foregoing parties provides for a commitment by Firebird to fund the DIP Facility of $370,000 and the Exit Facility of at least $1,250,000 (plus amounts necessary to pay the fees and expenses of the Liquidating Trustee prior to the resolution of the Colorado Litigation as agreed by Firebird, Debtor and the Liquidating Trustee), on terms to be agreed and consistent with the Lock-Up Term Sheet, the Lock-Up Agreement and the Exit Facility Term Sheet, which will be used to fund, among other things, the prosecution of the Colorado Liquidation. As consideration for Firebird's commitment to fund the Exit Facility and MS's agreement to prosecute the Colorado Litigation on a contingency fee basis, MS and Firebird will jointly be entitled to receive 45% of the Gross Litigation Proceeds from the Resolution of the Colorado Litigation (net of the Colorado Litigation Expenses) in accordance with and subject to the Plan, the Liquidating Trust Documents and the Lock-Up Term Sheet. The remaining proceeds from the Colorado Litigation will be available to fund distributions to Holders of Allowed General Unsecured Claims and Allowed Equity Interests. The Lock-Up Agreement is attached as Exhibit B to the Plan.

4.     Debtor's Activities Since the Petition Date. Debtor has negotiated the Plan and organized its assets for an orderly liquidation thereof. Debtor has been afforded breathing room under the automatic stay, and such stay remains in place unless otherwise modified by the Bankruptcy Court.

5.     Debtor's Chapter 11 Case. On September 3, 2009, Debtor (i) filed a notice of confession to the chapter 7 involuntary petition; (ii) converted the chapter 7 proceeding to a chapter 11 proceeding; (iii) filed the Plan; and (iv) filed a motion for debtor-in-possession financing (the "DIP Motion"). The Bankruptcy Court entered an order approving the DIP Motion on October 2, 2009. The DIP Facility provides Debtor with access to $430,000 of post-petition financing during the Chapter 11 Case. Pursuant to the DIP Facility, the DIP Lender is entitled to a first lien on the Colorado Litigation to secure the DIP Lender's claims and super-priority administrative expense claim status for claims arising from the DIP Facility. The DIP Facility is attached as Exhibit C to the Plan.

## ARTICLE VI
## THE PLAN

The following is a summary of the significant provisions of the Plan, which is qualified in its entirety by the provisions of the Plan. All Holders of Convenience Claims, General Unsecured Claims and Equity Interests are urged to carefully read the Plan.

1.    <u>Classes of Claims and Interests</u>. The Plan defines Class 1 as including only Holders of Convenience Claims. The Plan defines Class 2 as including only Holders of General Unsecured Claims. The Plan defines Class 3 as including only Holders of Equity Interests.

(a)    *Administrative Expenses*. Administrative Claims are not Impaired under the Plan and are conclusively deemed to accept the Plan pursuant to 1126(f) of the Bankruptcy Code.

2.    <u>Treatment of Claims and Interests</u>.

(a)    *Administrative Claims*. Subject to the provisions of sections 328, 330(a), and 331 of the Bankruptcy Code, the Liquidating Trust shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (3) at such time and upon such terms as may be agreed upon by such Holder and the Liquidating Trust; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims filed after the Administrative Bar Date or Administrative Claims Filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the Bar Date.

(b)    *Professional Fees*. The Bankruptcy Court shall fix in the Confirmation Order a date for filing of, and a date to hear and determine, all applications for final allowances of compensation or reimbursement of expenses under section 330 of the Bankruptcy Code or applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code.

(c)    *Convenience Claims*. On, or as soon as practicable after, the Effective Date, the Liquidating Trust shall pay, from the Exit Financing, a total of 95% of the amount Allowed to each Holder of an Allowed Convenience Claim, in full satisfaction of such Allowed Convenience Claim, up to a $3,000.00 cap, and to the extent the Class 1 Claims exceed $3,000.00 in the aggregate, Holders of Allowed Convenience Claims will be paid their Ratable Proportion, *pari passu*, with other Holders of Allowed Convenience Claims, with the excess amounts up to 95% receiving treatment as Class 2 General Unsecured Claims. A list of creditors expected to comprise the Class 1 Convenience Claims, along with their scheduled amounts, is listed on <u>Exhibit 4</u> hereto; <u>provided</u>, that Exhibit 4 shall not constitute an admission or waiver as to whether such Convenience Claims will be Allowed.

(d)    *General Unsecured Claims*. Holders of Allowed General Unsecured Claims will receive Class A shares in the Liquidating Trust, as defined in the Liquidating Trust Documents, in full satisfaction of their Allowed General Unsecured Claims and according to their Ratable Proportion, and, upon the Resolution of the Colorado Litigation, holders of Class A shares will be paid, *pari passu* with other holders of Class A shares, from the Liquidating Trust Assets. If the Liquidating Trust Assets are sufficient to pay holders of Class A shares in full and Class 2 has voted to accept the Plan by the statutory majorities set forth in section 1126 of the

Bankruptcy Code, then each holder of Class A shares shall be entitled to post-petition Interest on its Allowed General Unsecured Claim from the Petition Date through the Distribution Date. A list of creditors expected to comprise the Class 2 General Unsecured Claims, along with their scheduled amounts, is listed on <u>Exhibit 5</u> hereto; <u>provided</u>, that Exhibit 5 shall not constitute an admission or waiver as to whether such General Unsecured Claims will be Allowed.

        (e)    *Equity Interests*. Holders of Allowed Equity Interests will receive Class B shares in the Liquidating Trust, as defined in the Liquidating Trust Documents, in satisfaction of their Allowed Equity Interests and according to their Ratable Proportion, and, upon the Resolution of the Colorado Litigation, holders of Class B shares will be paid, *pari passu* with other holders of Class B shares from the remaining Liquidating Trust Assets, after the holders of Class A shares are paid in full with Interest on their Allowed General Unsecured Claims. With regard to Distributions to Equity Interests, the Liquidating Trust will make a Distribution to Goldbase Capital Limited (BVI) ("Goldbase") in an amount equal to ten percent (10%) of the recovery due to Holders of Equity Interests eligible to receive a Distribution under the Plan pursuant to an assignment of rights executed by Goldbase in favor of Debtor, which assignment will be implemented through the operation of the Plan and the Liquidating Trust Documents. A list of Holders of Equity Interests is too voluminous to list herein, but a listing was filed as part of Debtor's Schedules (Docket No. 25).

        3.    <u>Analysis of Projected Recovery</u>. Debtor has approximately $13,000,000 in pre-petition liabilities. Under the Plan, Holders of Allowed General Unsecured Claims and Allowed Equity Interests, in satisfaction of their Claims and Equity Interests, will receive Class A and B shares in the Liquidating Trust, respectively. Debtor cannot fairly and accurately project the amount of recovery, if any, for Holders of General Unsecured Claims and Equity Interests due to the impossibility of forecasting the amount of the Resolution of the Colorado Litigation or the value of other Liquidating Trust Assets. Additionally, the Preservation Costs must be paid prior to any recovery by Holders of Allowed General Unsecured Claims and Allowed Equity Interests. Holders of Allowed Convenience Claims will receive 95% of the Allowed amount of each Claim up to $3000 in the aggregate, and if the aggregate amount of the Convenience Claims exceed $3000, Holders of Allowed Convenience Claims will receive their Ratable Proportion.

## ARTICLE VII
## MEANS OF IMPLEMENTING THE PLAN

        1.    <u>Summary</u>. The Plan contains elements relating to the implementation of its key provisions, some of which are briefly discussed in this Article VII. The Plan is discussed in more detail elsewhere in the Disclosure Statement.

        2.    <u>Plan Funding</u>. Under the Plan, on the Effective Date, the Exit Lender will provide the Exit Facility to the Liquidating Trust for the purposes of funding, among other things, the Colorado Litigation until the Resolution, payment due to Holders of Allowed Convenience Claims in accordance with the Plan, and payment of Debtor's Administrative Claims and Liquidating Trust Expenses to the extent required to be paid prior to Resolution of the Colorado Litigation as agreed by the Liquidating Trustee, Debtor, and the Exit Lender, and Other Costs. No later than ten (10) calendar days prior to the date scheduled as the last day for voting to accept or reject the Plan, the Exit Lender will file with the Bankruptcy Court with a written

commitment to provide the Exit Facility and/or the definitive documents for the Exit Facility, which may thereafter be altered, amended, modified, or supplemented from time to time in accordance with the terms of the Plan, the Lock-Up Agreement, the Bankruptcy Code, and the Bankruptcy Rules. In consideration for the Exit Facility, and in addition to the Firebird Funding Obligations, the Exit Lender shall be entitled to receive the Exit Lender Share upon the Resolution of the Colorado Litigation in accordance with the Plan and the Liquidating Trust Documents.

      3.    <u>DIP Facility Claims</u>. Subject to the terms and conditions of the DIP Facility, all Obligations (as defined in the DIP Facility) of Debtor under the DIP Facility shall be rolled-up into the Exit Facility on the Effective Date and included in the principal amount outstanding thereunder. Upon the roll-up of Debtor's Obligations (as defined in the DIP Facility) into the Exit Facility, Debtor is deemed to have fully discharged its obligations under the DIP Facility and the DIP Documents and shall have no continuing obligations of any kind whatsoever under the DIP Facility or the DIP Documents.

      4.    <u>Discontinued Corporate Existence</u>. As soon as reasonably practicable after the Effective Date, Debtor will file articles of dissolution under the Yukon Business Corporations Act. Debtor will initiate the process of winding-up its Affiliates prior to the Effective Date as there is no value in the Affiliates.

      5.    <u>Formation of Liquidating Trust</u>. Prior to the Effective Date, Debtor will form the Liquidating Trust in a form substantially in accordance with Exhibit D to the Plan, and on the Effective Date, Debtor will assign and transfer to the Liquidating Trust all of Debtor's Assets, including, but not limited to, all of Debtor's right, title, and interest to and in the Colorado Litigation and the proceeds thereof. The Liquidating Trustee will oversee the Colorado Litigation until its Resolution for the benefit of Holders of Allowed General Unsecured Claims and Allowed Equity Interests, if applicable, in accordance with the terms of the Plan and the Liquidating Trust Documents. The Liquidating Trustee shall also orderly liquidate Debtor's other Assets (except to the extent such Assets, other than for funding purposes, are necessary to the prosecution of the Colorado Litigation) assigned to the Liquidating Trust pursuant to the Plan and may use the proceeds from the liquidated Assets and other monies it may obtain as necessary to fund expenses of the Liquidating Trust not otherwise funded by the Exit Facility. The Liquidating Trust shall be managed by a Liquidating Trustee selected by Debtor, MS, and Firebird and identified in a notice to be filed with the Bankruptcy Court no later than ten (10) calendar days prior to the Confirmation Hearing. Upon Resolution of the Colorado Litigation, the Liquidating Trust will distribute the Gross Litigation Proceeds in accordance with Article VI of the Plan. Additional powers of the Liquidating Trust and duties of the Liquidating Trustee will be more fully set forth in the Liquidating Trust Documents.

      6.    <u>Post-Effective Date Operations and Management</u>. From and after the Effective Date, the Liquidating Trust shall exist for the purpose of implementing the Plan, which obligation shall be concurrent to fulfilling its duties and obligations under the Plan and the Liquidating Trust Documents and taking any action consistent with the Plan and the orders entered in the Chapter 11 Case. The Liquidating Trust shall, consistent with the interests of Creditors and Holders of Equity Interests and the exercise of reasonable business judgment, except as limited elsewhere by the Plan or by the Liquidating Trust Documents: (i) undertake

those actions that are necessary, advantageous, or practicable to obtain the maximum value from the Colorado Litigation, including retention on a contingency fee basis of MS as head litigation counsel for the Liquidating Trust with respect to the Colorado Litigation; and (ii) endeavor in good faith and without undue delay to distribute the Gross Litigation Proceeds upon Resolution of the Colorado Litigation in accordance with the Plan and the Liquidating Trust Documents.

       7.    <u>Payment of the Liquidating Trustee</u>.  The Liquidating Trust Expenses necessary to be paid prior to the Resolution of the Colorado Litigation shall be paid from the Exit Facility as agreed by the Exit Lender, Debtor, and the Liquidating Trustee under the Liquidating Trust Documents and to the extent not paid by the Exit Facility, shall be paid from the Liquidating Trust Assets.

**ARTICLE VIII**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

       1.    <u>Summary</u>.  The Plan generally contemplates that all executory contracts and unexpired leases that are not expressly assumed are deemed rejected as of the Effective Date. Debtor does not expect that any executory contracts or unexpired leases exist, but if Debtor assumes, assigns, or rejects an executory contract or unexpired lease, Article V of the Plan will apply.

       2.    <u>Assumption of Executory Contracts and Unexpired Leases</u>.  Except as otherwise provided in the Plan, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, as of the Effective Date, Debtor shall be deemed to have rejected each pre-petition written executory contract and unexpired lease to which it is a party unless such executory contract or unexpired lease (a) was previously assumed upon motion by a Final Order; or (b) is the subject of any pending motion, including to assume, to assume on modified terms, to reject or to make any other disposition filed by Debtor on or before the Confirmation Date.  Without limiting the generality of the foregoing, all executory contracts and unexpired leases and licenses set forth on Schedule 1 to the Plan shall be assumed by Debtor; provided that any such lease or contract may be rejected upon written notice by Debtor prior to the Confirmation Date.  The Confirmation Order shall constitute an order of the Bankruptcy Court under section 365(a) of the Bankruptcy Code approving the rejection of pre-petition executory contracts and unexpired leases described above, as of the Effective Date. Notwithstanding anything to the contrary herein, Debtor reserves the right to assert that any license, franchise, or partially performed contract is a property right and not an executory contract.

       3.    <u>Assignment of Executory Contracts and Unexpired Leases</u>.  To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned pursuant to the Plan shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired

lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension or modify any term or condition upon any such transfer and assignment constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

4.      Cure Rights for Executory Contracts and Unexpired Leases Assumed Under the Plan.  Any monetary amounts by which each executory contract and unexpired lease to be assumed pursuant to the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure.  If there is a dispute regarding (a) the nature or amount of any Cure, (b) the ability of Debtor or the Liquidating Trust to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (c) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order by the Bankruptcy Court resolving the dispute and approving the assumption or assumption and assignment, as the case may be; provided, however, that Debtor shall be authorized to reject any executory contract or unexpired lease to the extent Debtor, in the exercise of its sound business judgment, concludes that the amount of the Cure obligation as determined by such Final Order, renders assumption of such executory contract or unexpired lease unfavorable to Debtors.  Cure amounts are listed on Schedule 2 to the Plan, which shall be filed at least ten (10) days prior to the Confirmation Hearing.  If no Cure amount for an assumed executory contract or unexpired lease is listed on Schedule 2 to the Plan, the Cure amount shall be deemed to be $0.

5.      Rejection Damages Bar Date for Rejections Pursuant to the Plan.  If the rejection of an executory contract or unexpired lease pursuant to the Plan results in a Claim, then such Claim shall be forever barred and shall not be enforceable against Debtor or its Assets unless a Proof of Claim is filed with the Court within thirty (30) days after entry of the Confirmation Order.  The foregoing applies only to Claims arising from the rejection of an executory contract or unexpired lease; any other Claims held by a party to a rejected contract or lease shall have been evidenced by a Proof of Claim filed by earlier applicable Bar Dates or shall be barred and unenforceable.

6.      Assumption of Executory Contracts and Unexpired Leases.  The contracts and leases set forth on Schedule 1 to the Plan shall be deemed assumed as of the Effective Date.  Debtor reserves the right, at any time prior to the Effective Date, except as otherwise specifically provided in the Plan, as additional protection against burdensome agreements, to seek to reject any executory contract or unexpired lease to which Debtor is a party and to file a motion requesting authorization for the rejection of any such executory contract or unexpired lease.

7.      Treatment of Claims Arising from Assumption or Rejection.  All Allowed Claims for Cure arising from the assumption of any executory contract or unexpired lease shall be treated as Administrative Claims under the Plan; all Allowed Claims arising from the rejection of an executory contract or unexpired lease shall be treated, to the extent applicable, as General Unsecured Claims or Convenience Claims, unless otherwise ordered by Final Order of the Bankruptcy Court; and all other Allowed Claims relating to an executory contract or unexpired lease shall have such status as they may be entitled to under the Bankruptcy Code as determined by Final Order of the Bankruptcy Court.

## ARTICLE IX
## PROVISIONS GOVERNING DISTRIBUTIONS

1.    <u>Summary</u>.  The central feature of the Plan is the Liquidating Trust.  The Liquidating Trust will make Distributions to Holders of Allowed General Unsecured Claims and Allowed Equity Interests in accordance with the Plan provisions governing Distributions.

2.    <u>Distributions for Allowed General Unsecured Claims and Allowed Equity Interests</u>.  Except as otherwise provided herein or as ordered by the Bankruptcy Court, all Distributions to Holders of Allowed General Unsecured Claims and Allowed Equity Interests shall be made on or as soon as practicable after the Resolution of the Colorado Litigation.

3.    <u>Distributions for Allowed Convenience Claims</u>.  Except as otherwise ordered by the Bankruptcy Court, all Distributions to Holders of Allowed Convenience Claims will be paid on the Effective Date from the Exit Financing.

4.    <u>Interest on Claims</u>.  To the extent that the Allowed General Unsecured Claims are paid in full, and Class 2 has voted to accept the Plan by the statutory majority set forth in section 1126 of the Bankruptcy Code, then each Holder of an Allowed General Unsecured Claim is entitled to receive Interest on its Claim from the Petition Date through the Distribution Date.

5.    <u>Distribution by Liquidating Trust</u>.  Upon Resolution of the Colorado Litigation, the Gross Litigation Proceeds shall be deposited in the Distribution Account.  The Liquidating Trust shall pay from the Gross Litigation Proceeds all Preservation Costs in accordance with the Plan and the Liquidating Trust Documents before any Distribution is made to Holders of Allowed General Unsecured Claims or Allowed Equity Interests.  Notwithstanding anything herein to the contrary, the obligations under the Exit Facility may be paid from the Liquidating Trust Assets, to the extent such Liquidating Trust Assets exist upon the date that the obligations under the Exit Facility become due and payable.  Preservation Costs shall be paid in the following order of priority: (i) first, to repay the Exit Facility, including the roll-up of the DIP Facility, in full; (ii) second, to repay the Colorado Litigation Expenses if not funded by the Exit Facility; (iii) third, to pay the Exit Lender Share and the MS Share; and (iv) fourth, to pay the Liquidating Trust Expenses not funded through the Exit Financing.  After the Preservation Costs are paid in full, the Liquidating Trust shall pay Holders of Allowed General Unsecured Claims in accordance with Article II.4.b of the Plan with the remainder, if any, to Holders of Allowed Equity Interests in accordance with Article II.5.b. of the Plan.

6.    <u>Means of Cash Payment</u>.  Distributions shall be made in Cash, and shall be made at the Liquidating Trust's sole discretion, unless otherwise provided in the Liquidating Trust Documents, by (i) checks drawn; or (ii) by wire transfer from a domestic bank selected by the Liquidating Trust.  Cash payments to foreign creditors may be made, at the Liquidating Trust's option, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.  Distributions made in the form of check will be null and void if not cashed within 120 days of the date of issuance thereof.  For purposes of effectuating Distributions under the Plan, any Claim denominated in foreign currency shall be converted to U.S. Dollars pursuant to the applicable published exchange rate on the Petition Date.

7.    Delivery of Distributions.  Distributions relating to the Preservation Costs shall be made in accordance with the addresses provided in the Liquidating Trust Documents. Distributions relating to Allowed Convenience Claims shall be paid to the address provided in the Proof of Claim Filed for each Allowed Convenience Claim, or, if scheduled, the address provided on the Schedule.  Distributions relating to Allowed General Unsecured Claims shall be paid to the address provided in the Proof of Claim Filed for each Allowed General Unsecured Claim, or, if scheduled, the address provided on the Schedule.  Distributions relating to Allowed Equity Interests will be paid to the address provided on the Proof of Claim Filed for each Holder of an Allowed Equity Interest, or, if scheduled, the address provided on the Schedule.  If any Distribution is returned as undeliverable, the Liquidating Trustee shall make a reasonable effort to determine the correct address for delivery of such Distribution.  Amounts in respect of undeliverable Distributions shall be returned to the Liquidating Trust to hold in trust until one hundred twenty (120) days after the Distribution Date, at which time, if such undeliverable funds remain undelivered and unclaimed, the Liquidating Trust shall make a Distribution to the Holders of Allowed General Unsecured Claims, according to their Ratable Proportion, unless such Claims have been paid in full with Interest, whereupon the Liquidating Trust will make a Distribution to the Holders of Allowed Equity Interests according to their Ratable Proportion.

8.    De Minimis Distributions.  Notwithstanding anything to the contrary in the Liquidating Trust Documents, the Liquidating Trust shall not be required to distribute, and shall not distribute, Cash to the Holder of any Allowed Convenience Claim if the amount of the Allowed Convenience Claim is less than $100.00.  Any Holder of an Allowed Convenience Claim on account of which the Cash to be distributed is less than $100.00 shall have such Claim discharged and shall be forever barred from asserting any such Claim against Debtor.

9.    Fractional Distributions.  No payment of fractional dollars shall be made pursuant to the Plan.  Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half-dollars or more being rounded up, and fractions of less than a half-dollar being rounded down.

10.    Withholdings, Payment, and Reporting Requirements.  In connection with the Plan and all Distributions under the Plan, the Liquidating Trust shall, to the extent applicable, comply with all tax withholding, payment, and reporting requirements imposed by any federal, state, provincial, local, or foreign taxing authority, and all Distributions under the Plan shall be subject to any such withholding, payment, and reporting requirements. The Liquidating Trust shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding, payment, and reporting requirements.  Notwithstanding any other provision of the Plan, (a) each Holder of an Allowed Claim or an Allowed Equity Interest that is to receive a Distribution pursuant to the Plan shall have sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any governmental unit, including income, withholding, and other tax obligations, on account of such Distribution; and (b) no Distribution shall be made to or on behalf of such Holder pursuant to the Plan unless and until such Holder has made arrangements reasonably satisfactory to the Liquidating Trust for the payment and satisfaction of such withholding tax obligations or such tax obligation that would be imposed upon the Liquidating Trust in connection with such Distribution.  Any property to be

distributed pursuant to the Plan shall, pending the implementation of such arrangements, be treated as an undeliverable Distribution pursuant to Article VI.6 of the Plan.

11.  No Distribution in Excess of Allowed Amounts. Notwithstanding anything to the contrary in the Plan, no Holder of an Allowed General Unsecured Claim shall receive in respect of such Claim any Distribution in excess of the Allowed amount of such Claim plus Interest thereon nor shall a Holder of an Allowed Convenience Claim receive in respect of such Claim any Distribution in excess of the Allowed amount.

12.  Allocation of Distributions. All Distributions received under the Plan by Holders of Allowed General Unsecured Claims or Allowed Convenience Claims shall be deemed to be allocated first to the principal amount of such Claim as determined for United States federal income tax purposes and then to accrued interest, if any, with respect to any such Claim.

13.  Tax Considerations. THERE ARE A NUMBER OF INCOME TAX CONSIDERATIONS, RISKS, AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN AND RECEIVER OF DISTRIBUTIONS THEREUNDER. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSIONS SET FORTH IN ARTICLE XIII OF THE DISCLOSURE STATEMENT REGARDING CERTAIN INCOME TAX CONSEQUENCES IN THE UNITED STATES AND OTHER JURISDICTIONS UNDER THE PLAN TO HOLDERS OF CLAIMS AND EQUITY INTERESTS ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN. NOTHING HEREIN SHOULD BE CONSTRUED TO CONSTITUTE TAX ADVICE TO HOLDERS OF SUCH CLAIMS AND EQUITY INTERESTS.

**ARTICLE X**
**PROCEDURES FOR RESOLVING DISPUTED CLAIMS**

1.  Summary. The paragraphs contained in this Article X detail the procedures by which Debtor or the Liquidating Trust may resolve Disputed Claims.

2.  Prosecution of Objections to Claims.

(a)  *Objections to Claims; Estimation Proceedings*. Except as set forth in the Plan or any applicable Court order, all objections to Claims must be filed and served on the Holders of such Claims by the applicable Claims Objection Bar Date, as the same may be extended by the Bankruptcy Court. If a timely objection has not been filed to a Proof of Claim or the Schedules have not been amended with respect to a Claim that (i) was scheduled by Debtor but (ii) was not scheduled as contingent, unliquidated, and/or disputed, the Claim to which the Proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. Notice of any motion for an order extending any Claims Objection Bar Date shall be required to be given only to those persons or entities that have requested notice in the Chapter 11 Case, or to such persons as the Bankruptcy Court shall order. Debtor (prior to the Effective Date) may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to

estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event the Bankruptcy Court so estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court, as applicable. If the estimated amount constitutes a maximum limitation on such Claim, Debtor may elect to pursue any supplemental proceedings to object to any ultimate payment on such Claim. All of the aforementioned Claims objection, estimation, and resolution procedures are cumulative and are not necessarily exclusive of one another. Claims may be estimated and thereafter resolved by any permitted mechanism.

      3.    <u>Treatment of Disputed Claims</u>.

      (a)    *No Distribution Pending Allowance*. Notwithstanding any other provisions of the Plan, no payments or Distributions will be made on account of a Disputed Claim or, if less than the entire Claim is a Disputed Claim, the portion of a Claim that is Disputed, until such Disputed Claim becomes an Allowed Claim.

      (b)    *Distributions on Account of Disputed Claims Once They Are Allowed*. The Liquidating Trust shall, on the applicable Distribution Date, make Distributions on account of any Disputed Claim that has become an Allowed Claim. Such Distributions shall be made pursuant to the provisions of the Plan governing the applicable Class. Such Distributions shall be based upon the Distributions that would have been made to the Holder of such Claim under the Plan if the Disputed Claim had been an Allowed Claim on the Effective Date in the amount ultimately Allowed.

      4.    <u>Provisions for Disputed Claims</u>. On the Distribution Date, the Liquidating Trust shall withhold property, according to its Ratable Proportion, that would otherwise be distributed to Claims entitled to Distributions under the Plan on such date, in a separate Disputed Claims Reserve, such amounts or property as may be necessary to equal one hundred percent (100%) of Distributions to which Holders of such Disputed Claims would be entitled under the Plan if such Disputed Claims were allowed in their Disputed Claims amount. The Liquidating Trust may request, if necessary, estimation for any Disputed Claim that is contingent or unliquidated, or for which the Liquidating Trust determines to reserve less than the amount of the Claim. The Liquidating Trust shall withhold the applicable portion of the Disputed Claims Reserve with respect to such Claims based upon the estimated amount of each such Claim as estimated by the Bankruptcy Court. If the Liquidating Trust elects not to request such an estimation from the Bankruptcy Court with respect to a Disputed Claim that is contingent or unliquidated, the Liquidating Trust shall withhold the applicable Disputed Claims Reserve based upon the good faith estimate of the amount of such Claim by the Liquidating Trust. If practicable, the Liquidating Trust will invest any Cash that is withheld as the applicable Disputed Claims Reserve in an appropriate manner to ensure the safety of the investment. Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the Holder of a Disputed Claim to post-petition interest on such Claim.

      5.    <u>Accounts; Escrows; Reserves</u>. The Liquidating Trust shall, subject to and in accordance with the provisions of the Plan (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, reserve or

escrow; (b) create, fund, and withdraw funds from, as appropriate, the Administrative Claims Reserve, and the Professional Fee Reserve; and (c) if practicable, invest any Cash that is withheld as the applicable claims reserve in an appropriate manner to ensure the safety of the investment. Nothing in the Plan or the Disclosure Statement shall be deemed to entitle the Holder of Administrative Claims or Professional Fee Claims to post-petition interest on such Claim.

(a)     *Administrative Claims Reserve*. On the Effective Date (or as soon thereafter as is practicable), the Liquidating Trust shall create and fund the Administrative Claims Reserve in the amount budgeted to be used by the Liquidating Trust to pay Distributions on account of Allowed Administrative Claims, including Claims under section 503(b)(9) of the Bankruptcy Code. To the extent necessary to fund payments to Allowed Claims thereunder, the funds in the Administrative Claims Reserve shall be periodically replenished by the Liquidating Trust in such amounts as may be determined by the Liquidating Trust in its sole discretion. The Liquidating Trust shall be obligated to pay all Allowed Claims designated to be paid from the proceeds of the Administrative Claims Reserve thereunder in excess of the amounts actually deposited in the Administrative Claims Reserve. In the event that any Cash remains in the Administrative Claims Reserve after payment of all Allowed Claims to be paid thereunder, such Cash shall be added to the Exit Financing amount and used by the Liquidating Trust to fund the Colorado Litigation and the Liquidating Trust Expenses, subject to the terms and conditions of the Exit Facility and any budget related thereto.

(b)     *Professional Fee Reserve*. The Liquidating Trust shall create and fund the Professional Fee Reserve on the Effective Date (or as soon thereafter as is practicable) in the amount of the budgeted but unpaid Professional fees projected through the Effective Date, which amount shall be used to pay Allowed Professional Fee Claims held by (i) any Professionals working on behalf of Debtor; and (ii) counsel and any advisors to the Creditors Committee, if one is appointed. The Liquidating Trust shall be obligated to pay all Allowed Professional Fee Claims designated to be paid from the proceeds of the Professional Fee Reserve in excess of the amounts actually deposited in the Professional Fee Reserve. In the event that any Cash remains in the Professional Fee Reserve after payment of all Allowed Professional Fee Claims, such Cash shall be added to the Exit Financing amount and used by the Liquidating Trust to fund the Colorado Litigation and the Liquidating Trust Expenses, subject to the terms and conditions of the Exit Facility and any budget related thereto.

## ARTICLE XI
## CONDITIONS PRECEDENT

1.     <u>Summary</u>. This Article XI sets forth the conditions listed in the Plan which must occur prior to the Confirmation Date and the Effective Date.

2.     <u>Conditions Precedent to the Confirmation Date</u>. Prior to the Confirmation Date, the following must be satisfied:

(a)     entry of the Confirmation Order in form and substance reasonably satisfactory to Debtor and each of the Lock-Up Support Parties, which, among other things:

(i)      provides that Debtor is authorized to take all actions necessary or appropriate to enter into, implement, and consummate the Liquidating Trust Documents or other documents created in connection with the Plan, including but not limited to, the transfer of Debtor's Assets, including, but not limited to the Colorado Litigation and the proceeds thereof, to the Liquidating Trust;

(ii)      provides that either Debtor or the Liquidating Trust is authorized to take all actions necessary or appropriate to apply for an order of recognition in Canada which recognizes the Confirmation Order;

(iii)      approves the Exit Facility; and

(iv)      provides that notwithstanding Rule 3020(e) of the Bankruptcy Rules, the Confirmation Order shall be immediately effective, subject to the terms and conditions of the Plan;

(b)      the Liquidating Trust has been duly created and properly formed; and

(c)      Notwithstanding the foregoing, Debtor reserves the right to waive the occurrence of any condition precedent to the occurrence of the Confirmation Date or to modify any of the foregoing conditions precedent; provided, however, that Debtor shall not be entitled to waive or modify any condition precedent without the consent of each of the Lock-Up Support Parties, and with respect to any waiver or modifications affecting the DIP Facility or the Exit Facility, the DIP Lender and the Exit Lender, respectively.  Any such written waiver of a condition precedent set forth in Article XI of the Plan may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

3.      <u>Conditions Precedent to the Effective Date</u>.  Prior to the Effective Date, the following must be satisfied:

(a)      occurrence of the Confirmation Date;

(b)      the Confirmation Order is a Final Order;

(c)      the documents evidencing the Exit Facility shall be in form and substance acceptable to Debtor, MS, and Firebird and consistent in all material respects with the Exit Facility Term Sheet; and, to the extent that such documents require execution by multiple parties, all parties have duly executed such documents, and all conditions precedent to the effective date of such documents have been satisfied or waived;

(d)      all material authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan have been obtained;

(e)      all material actions, documents, and agreements necessary to implement the Plan, including, but not limited to the Liquidating Trust Documents, shall have been effected or executed;

(f)    a Liquidating Trustee acceptable to Debtor, MS, and Firebird has been appointed; and

(g)    the Administrative Claims Reserve and Professional Fee Reserve have been established.

## ARTICLE XII
## RETENTION OF JURISDICTION

1.    <u>Summary</u>.  This Article XII contains a non-exhaustive listing of matters with regard to the Chapter 11 Case over which the Bankruptcy Court retains jurisdiction.  Debtor is considering removing the Colorado Litigation from state court to federal court.  At the hearing on the adequacy of this Disclosure Statement, OAO Lukoil, named defendant in the Colorado Litigation, objected to the Plan's provision in Article IX.1.e which retains for the Bankruptcy Court jurisdiction over adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to the Colorado Litigation.  Debtor expects that if the Colorado Litigation is removed, such removal will be met with further objection by OAO Lukoil, including the possible filing of a motion to remand or abstain, or otherwise as consistent with OAO Lukoil's rights.  Issues regarding the propriety of the removal of the Colorado Litigation may not be resolved until after confirmation of the Plan.  While the outcome of any dispute over removal cannot be predicted, your vote on the enclosed Ballot is hereby informed of the possibility that the Colorado Litigation may be removed to federal court and a final decision on the removal thereof may occur after confirmation of the Plan.

2.    <u>Scope of Retention of Jurisdiction</u>.  The Plan states that under sections 105(a) and 1142 of the Bankruptcy Code, and notwithstanding entry of the Confirmation Order and occurrence of the Effective Date, and except as otherwise ordered by the Bankruptcy Court, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Case and the Plan to the fullest extent permitted by law (provided, however, that notwithstanding the foregoing, with respect to all civil proceedings arising in or related to the Chapter 11 Case and the Plan, the Bankruptcy Court shall have original but not exclusive jurisdiction, in accordance with section 1334(b) of title 28 of the United States Code), including, among other things, jurisdiction to:

(a)    allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured, or unsecured status of any Claim not otherwise Allowed under the Plan, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the allowance of Claims;

(b)    hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under sections 327, 328, 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code;

(c)    hear and determine all matters with respect to the assumption or rejection of any executory contract or unexpired lease to which a Debtor is a party or with respect to which a Debtor may be liable, including, if necessary, the nature or amount of any required Cure or the liquidation or allowance of any Claims arising therefrom;

(d)      effectuate performance of and payments under the provisions of the Plan and enforce remedies upon any default under the Plan;

(e)      hear and determine any and all adversary proceedings, motions, applications, and contested or litigated matters arising out of, under, or related to, the Chapter 11 Case, the Colorado Litigation, or the Plan;

(f)      enter such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, the Disclosure Statement or the Confirmation Order;

(g)      hear and determine disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan, provided, however, that any dispute arising under or in connection with the Exit Facility shall be dealt with in accordance with the provisions of the governing documents;

(h)      consider any modifications of the Plan, cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(i)      issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the implementation, consummation, or enforcement of the Plan or the Confirmation Order;

(j)      enter and implement such orders as may be necessary or appropriate if the Confirmation Order is for any reason reversed, stayed, revoked, modified, or vacated;

(k)      hear and determine any matters arising in connection with or relating to the Plan, the Plan Supplement, the schedules to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan, the Plan Supplement, the schedules to the Plan, the Disclosure Statement, or the Confirmation Order;

(l)      enforce, interpret, and determine any disputes arising in connection with any stipulations, orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

(m)      except as otherwise limited in the Plan, recover all assets of Debtor and property of the Estate, wherever located;

(n)      hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under, or not inconsistent with, provisions of the Bankruptcy Code; and

(p)     enter a final decree closing the Chapter 11 Case.

3.     <u>Failure of Bankruptcy Court to Exercise Jurisdiction</u>.  If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Case, including the matters set forth in Article IX.1 of the Plan, the provisions of Article IX.1 of the Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

**ARTICLE XIII**
**CERTAIN UNITED STATES FEDERAL TAX CONSEQUENCES**

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Plan to Holders of Claims that are entitled to vote to accept or reject the Plan.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. federal income tax consequences described below.  However, nothing in this summary should be construed to constitute tax advice.  Holders of Claims and Equity Interests entitled to vote are encouraged to seek tax advice for their respective jurisdictions.

This summary does not address all aspects of U.S. federal income taxation that may be relevant to a particular Holder of a Claim or Equity Interest in light of its particular facts and circumstances or to certain types of Holders of Claims and Equity Interests subject to special treatment under the United States Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim or Equity Interest as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass through entity, persons that have a "functional currency" other than the U.S. Dollar, and persons who acquired or expect to acquire either an equity interest or other security in a Debtor or a Claim or Equity Interest in connection with the performance of services).  In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation.

A substantial amount of time may elapse between the date of the Disclosure Statement and the receipt of a Distribution under the Plan.  Events occurring after the date of the Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. federal income tax consequences of the Plan and the transactions contemplated thereunder.  There can be no assurance that the Internal Revenue Service ("IRS") or other taxing authority will not take a contrary view with respect to one or more of the tax issues facing Holders of Claims or Equity Interests which are entitled to vote on the Plan.  No

ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by Debtor with respect thereto.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THE DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM OR EQUITY INTEREST FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE UNITED STATES TAX CODE; AND (B) SUCH DISCUSSION IS INCLUDED HEREBY BY DEBTOR IN CONNECTION WITH  THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY DEBTOR OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN.**

**EACH HOLDER OF A CLAIM OR EQUITY INTEREST ENTITLED TO VOTE ON THE PLAN SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR WHO IS LICENSED TO PRACTICE IN THE APPROPRIATE JURISDICTION.**

## ARTICLE XIV
## MISCELLANEOUS PROVISIONS

1. <u>Administrative Claims</u>.  All Administrative Expense Requests must be made by application filed with the Bankruptcy Court and served on counsel, if any, for the Liquidating Trust no later than forty-five (45) days after the Effective Date.  In the event that the Liquidating Trust objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, (a) Holders of Administrative Claims first arising from and after the Petition Date through and including _____, 2009, must file their Administrative Expense Requests on or before ____, 2009, at 5:00 p.m. (Mountain), or their Claims shall be forever barred; (b) no application seeking payment of an Administrative Claim need be filed with respect to an undisputed post-petition obligation which was paid or is payable by Debtor in the ordinary course of business; provided, however, that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; and (c) no application seeking payment of an Administrative Claim need be filed with respect to Cure owing under an executory contract or unexpired lease if the amount of Cure is fixed or proposed to be fixed by order of the Bankruptcy Court pursuant to a motion to assume and fix the amount of Cure filed by Debtor and a timely objection asserting an increased amount of Cure filed by the non-Debtor party to the subject contract or lease.

2. <u>Professional Fee Claims</u>.

(a)     All final requests for payment of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code must be made by application filed with the Bankruptcy Court and served on the Liquidating Trust, its counsel, if any, counsel to the Creditors Committee, if any, and other necessary parties-in-interest no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to such applications must be filed and served on the Liquidating Trust, its counsel, if any, counsel to the Creditors Committee, if any, and the requesting Professional or other entity on or before the date that is thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable application was served.

(b)     Both Debtor and the Liquidating Trust may, without application to or approval by the Bankruptcy Court, retain Professionals and pay reasonable professional fees and expenses, subject to the budget for the DIP Facility or the Exit Facility, as applicable, in connection with services rendered to it after the Effective Date.

3.     Payment of Statutory Fees; Filing of Quarterly Reports.

(a)     All fees payable pursuant to section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on or before the Effective Date. All such fees that arise after the Effective Date shall be paid by the Liquidating Trust.  The obligation of Debtor to pay quarterly fees to the U.S. Trustee pursuant to section 1930 of title 28 of the United States Code shall continue until such time as the Chapter 11 Case is closed.

(b)     The obligation of Debtor to file quarterly financial reports as required by the U.S. Trustee shall continue until the Chapter 11 Case is closed.

4.     Modifications and Amendments.

(a)     Under the Plan, Debtor may, with the written consent of the Lock-Up Support Parties, alter, amend, or modify the Plan or any Exhibits thereto under section 1127(a) of the Bankruptcy Code at any time prior to the Confirmation Date.  Debtor shall provide parties-in-interest with notice of such amendments or modifications as may be required by the Bankruptcy Rules or order of the Bankruptcy Court.  A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder.  In the event of any dispute as to whether such proposed alteration, amendment, modification, or clarification materially and adversely changes the treatment of the Claim or Equity Interest of any such Holder, Debtor shall bear the burden of demonstrating that such proposed alteration, amendment, modification, or clarification does not materially adversely change the treatment of the Claim or Equity Interest of such Holder.

(b)     After the Confirmation Date and prior to substantial consummation (as defined in section 1101(2) of the Bankruptcy Code) of the Plan, Debtor may, under section 1127(b) of the Bankruptcy Code, institute proceedings in the Bankruptcy Court to remedy any defect or omission or to reconcile any inconsistencies in the Plan, the Disclosure Statement

approved with respect to the Plan, or the Confirmation Order, and such matters as may be necessary to carry out the purpose and effect of the Plan so long as such proceedings do not adversely affect the treatment of Holders of Claims or Equity Interests under the Plan; provided, however, that, to the extent required, prior notice of such proceedings shall be served in accordance with the Bankruptcy Rules or an order of the Bankruptcy Court. A Holder of a Claim or Equity Interest that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, modified, or clarified, if the proposed alteration, amendment, modification, or clarification does not materially and adversely change the treatment of the Claim or Equity Interest of such Holder. In the event of any dispute as to whether such proposed alteration, amendment, modification, or clarification materially and adversely changes the treatment of the Claim or Equity Interest of any such Holder, Debtor shall bear the burden of demonstrating that such proposed alteration, amendment, modification, or clarification does not materially adversely change the treatment of the Claim or Equity Interest of such Holder.

(c)     Continuing Exclusivity Period.  Subject to further order of the Bankruptcy Court, until the Effective Date, Debtor shall, pursuant to section 1121 of the Bankruptcy Code, retain the exclusive right to amend the Plan and to solicit acceptances thereof.

(d)     Severability of Plan Provisions.  If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of Debtor or the Liquidating Trust, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

(e)     Binding Effect on Successors and Assigns.  The rights, benefits, and obligations of any Person or Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, personal representative, successor, or assign of such Person or Entity, including, but not limited to, Debtor, the Liquidating Trust, and all other parties-in-interest in the Chapter 11 Case.

(i)     Compromises and Settlements.  From and after the Effective Date, the Liquidating Trust may compromise and settle various Claims against it, and Causes of Action and/or Avoidance Actions not otherwise released under the Plan that it may have against other Persons or Entities without any further approval by the Bankruptcy Court; provided, however, that to the extent any such Claims, Causes of Action or Avoidance Actions are pending before the Bankruptcy Court pursuant to filings made during the pendency of the Chapter 11 Case, the Liquidating Trust shall be required to obtain an appropriate order of the Bankruptcy Court concluding any such filings. Until the Effective Date, Debtor expressly reserves the right to compromise and settle (subject to the approval of the Bankruptcy Court) Claims against it, and Causes of Action, Avoidance Actions, or other claims that it may have against other Persons or

Entities. Notwithstanding the foregoing, the Colorado Litigation (and any Claim, Cause of Action, or Avoidance Action not otherwise released under the Plan) may only be compromised or settled in accordance with the Liquidating Trust Documents.

5. <u>Releases and Related Matters.</u>

(a) *Releases by Debtor.*

(i) The Plan provides for releases by Debtor in favor of its present or former directors, officers, employees, advisors, or shareholders, its Professionals, and the Creditors Committee, if any, the Lock-Up Support Parties, the DIP Lender, the Exit Lender, and each of their respective advisors. Debtor does not believe that it has any valid claim against any of its present or former directors, officers, employees, advisors, or shareholders, against any of its subsidiaries, any of its Professionals, or the Creditors Committee, if any, and its advisors. Moreover, any action brought to enforce a potential claim would involve significant costs to Debtor, including legal expenses and the distraction of Debtor's key personnel from the demands of the orderly liquidation of Debtor. In light of these considerations, and given the contributions made by the recipients of the releases to Debtor's business and liquidation efforts, these releases are appropriate and in the best interests of Debtor's Estate.

**(ii) Specifically, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, Debtor and any Person or Entity seeking to exercise the rights of Debtor's Estate, including, without limitation, any successor to Debtor or any representative of the Estate appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action (including claims or causes of action arising under Chapter 5 of the Bankruptcy Code), and liabilities whatsoever in connection with or related to Debtor, the conduct of Debtor's business, the Chapter 11 Case, or the Plan (other than the rights of Debtor to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to Debtor, the conduct of Debtor's business, the Chapter 11 Case, or the Plan, and that may be asserted by or on behalf of Debtor or the Estate, against (i) any of the present or former shareholders, directors, officers, employees or advisors of Debtor; (ii) any Professionals of Debtor; (iii) the Creditors Committee, if any, its members, and its and their advisors, respectively (but not its members in their individual capacities); (iv) the Lock-Up Support Parties and each of their shareholders, members, managers, partners, directors, officers, employees, or advisors (except with respect to the obligations of the Lock-Up Support Parties under the Lock-Up Agreement); (v) the DIP Lender and its members, managers, partners, directors, officers, employees, or advisors (except with respect to its obligations under the DIP Facility); and (vi) the Exit Lender and its members, managers, partners, directors, officers, employees, or advisors (except with respect to its obligations under the Exit Facility); *provided, however, that nothing in Article X.5.a of the Plan shall be deemed to prohibit Debtor or the Liquidating*

**Trust from asserting and enforcing any claims, obligations, suits, judgments, demands, debts, rights, causes of action or liabilities it may have against any employee (including directors and officers) for alleged breach of confidentiality, or any other contractual obligations owed to Debtor or the Liquidating Trust, including non-compete and related agreements or obligations. Nothing herein constitutes a waiver of any right of Debtor or the Liquidating Trust to (i) enforce all rights and claims concerning any and all intellectual property (including, without limitation, trademarks, copyrights, patents, customer lists, trade secrets and confidential or proprietary business information), all of which rights are expressly reserved and not released and (ii) assert any defense based on whether or not applicable standards have been met.**

(b)     *Preservation of Litigation Rights.*  To the extent that Debtor maintains an interest in any Cause of Action against Lukoil, Arkhangelskgeoldobycha, or any of their affiliates, such interests in any Cause of Action are wholly exempt from the releases contemplated by Article X.5.a of the Plan. The Colorado Litigation, as defined above, refers to that certain action between Archangel Diamond Corporation, as Plaintiff, against Lukoil and Arkhangelskgeoldobycha, as Defendants, commenced in the District Court of the City and County of Denver, Colorado on November 27, 2001, case number 01CV6514. Debtor or the Liquidating Trust expressly do not release any rights with respect to the Colorado Litigation, as such may arise at any time, and nothing contained herein shall be construed as a release by Debtor or the Liquidating Trust of the Colorado Litigation.

(c)     *Releases by Holders of Claims.*

(i)     The Holders of Allowed Claims which will receive Distributions pursuant to the Plan are receiving material, specific, and identifiable consideration for such releases consisting of: (a) the services and contributions of the Releasees to Debtor's business and liquidation, and (b) the right to receive a Distribution under the Plan. Unless a member of Class 1, Class 2, or Class 3 votes to reject the Plan, such member will be bound by the release contained in Article X.5.c of the Plan which is also contained in Article XIV.5.c.ii below and on the Ballot.

(ii)     **Specifically, as of the Effective Date and to the fullest extent permitted by law, for good and valuable consideration, including, but not limited to Debtor's assignment of its Assets to the Liquidating Trust, the adequacy of which is hereby confirmed, each Holder of a Claim or Equity Interest that is eligible to receive a Distribution pursuant to the Plan and that does not vote to reject the Plan shall be deemed to forever release, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities whatsoever against (i) Debtor, its successors and assigns, and Debtor's Estate; (ii) the present or former shareholders, directors, officers, employees, Professionals, or advisors of Debtor or the Liquidating Trust; (iii) the Lock-Up Support Parties and each of their shareholders, members, managers, partners, directors, officers, employees, or advisors (except with respect to any rights or claims of a Lock-Up Support Party under the Lock-Up Agreement vis-à-vis another Lock-Up Support Party that survive the Effective Date in accordance with the terms of the Lock-Up Agreement); (iv) the DIP Lender and its members, managers, partners, directors, officers, employees, or advisors; and (v) the Exit Lender and its**

members, managers, partners, directors, officers, employees, or advisors (collectively, the "Releasees"), in connection with or related to Debtor, the conduct of Debtor's business, the Chapter 11 Case, or the Plan (other than the rights under the Plan or reserved in the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereunder arising, in law, equity, or otherwise, that are based in whole or part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to Debtor, the conduct of Debtor's business, the Chapter 11 Case, or the Plan.

6.    Injunction.

(a)    Except as provided in the Plan or the Confirmation Order, as of the Effective Date, all Persons or Entities that have held, currently hold, may hold, or allege that they hold, a Claim or other debt, liability, or Equity Interest that is eligible to be discharged pursuant to the terms of the Plan are permanently enjoined from taking any of the following actions against Debtor, its respective Affiliates, their property, or the Liquidating Trust on account of any such discharged Claims, debts, liabilities, Equity Interest or terminated rights: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff or right of subrogation of any kind against any debt, liability, or obligation due to Debtor; or (v) commencing or continuing any action, in each such case in any manner, in any place, or against any Person or Entity that does not comply with or is inconsistent with the provisions of the Plan.

(b)    As of the Effective Date, all Persons or Entities that have held, currently hold, or may hold, a Claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, liability, or Equity Interest that is contemplated for release pursuant to the Plan are permanently enjoined from taking any of the following actions on account of such released Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, liabilities or Equity Interest: (i) commencing or continuing, in any manner or in any place, any action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (iii) creating, perfecting, or enforcing any lien or encumbrance; (iv) asserting a setoff against any debt, liability, or obligation due to any released Person or Entity; or (v) commencing or continuing any action, in any manner, in any place, or against any Person or Entity that does not comply with or is inconsistent with the provisions of the Plan.

(c)    Without limiting the effect of the foregoing provisions of Article X.6 of the Plan upon any Person or Entity, by virtue of its eligibility to accept Distributions pursuant to the Plan, each Holder of an Allowed Claim or Allowed Equity Interest shall be deemed to have specifically consented to the injunctions set forth in Article X.6 of the Plan.

(d)    Nothing in Article X.6 of the Plan shall impair (i) the rights of any Holder of a Disputed Claim to establish its Claim in response to an objection filed by Debtor or the Liquidating Trust; (ii) the rights of any defendant in an Avoidance Action

filed by Debtor or the Liquidating Trust to assert defenses in such action; or (iii) the rights of any party to an executory contract or unexpired lease that has been assumed by Debtor pursuant to an order of the Bankruptcy Court or the provisions of the Plan to enforce such assumed contract or lease.

      7.    <u>Exculpation and Limitation of Liability</u>.

      **(a)    The Plan contains language exculpating key parties in interest with respect to their conduct during the Chapter 11 Case. Specifically, neither Debtor, the Liquidating Trust, the Creditors Committee (as to itself or any of its members), the Lock-Up Support Parties, the DIP Lender, the Exit Lender, nor any of their respective present or former members, officers, managers, directors, employees, advisors, Professionals, or agents, shall have or incur any liability to any Holder of a Claim or Equity Interest, or any other party-in-interest, or any of their respective agents, employees, representatives, advisors, attorneys, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, the solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions that are the result of fraud, gross negligence, or willful misconduct; provided further, however, that the foregoing is not intended to limit or otherwise impact any defense of qualified immunity that may be available under applicable law.**

      **(b)    Notwithstanding any other provision of the Plan, no Holder of a Claim or Equity Interest, no other party-in-interest, none of their respective agents, employees, representatives, advisors, attorneys, or affiliates, and none of their respective successors or assigns shall have any right of action against any of Debtor, the Creditors Committee, the Lock-Up Support Parties, the DIP Lender, the Exit Lender, or of their respective present or former members, officers, managers, directors, employees, advisors, Professionals, or agents, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the formulation, negotiation, or implementation of the Plan, solicitation of acceptances of the Plan, the pursuit of Confirmation of the Plan, the Confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for acts or omissions which are the result of fraud, gross negligence, or willful misconduct.**

      8.    <u>Term of Injunction or Stays</u>. Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Effective Date.

      9.    <u>Revocation, Withdrawal, or Non-Consummation</u>. Debtor reserves the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file subsequent plans of reorganization. If Debtor revokes or withdraws the Plan prior to the Confirmation Date, or if Confirmation or the Effective Date does not occur, then (a) the Plan shall be null and void in

all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (i) constitute or be deemed to constitute a waiver or release of any Claims against, or any Equity Interests in, Debtor, or any Avoidance Actions, Causes of Action or other claims by or against Debtor, the Creditors Committee, or any Person or Entity, (ii) prejudice in any manner the rights of Debtor, the Creditors Committee, or any Person or Entity in any further proceedings involving Debtor, or (iii) constitute an admission of any sort by Debtor, the Creditors Committee, or any other Person or Entity.

      10.    <u>Notices</u>.  Any notice, request, or demand required or permitted to be made or provided under the Plan shall be (a) in writing; (b) served by (i) certified mail, return receipt requested, (ii) hand delivery, (iii) overnight delivery service, (iv) first class mail, or (v) facsimile transmission; and (c) deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> Archangel Diamond Corporation
> 65 Overlea Boulevard
> Suite 400
> Toronto, Ontario M4H 1P1
> CANADA
> Attention:    Robert Shirriff
>                     Steve Thomas
> Facsimile:    (416) 421-6080

> -with a copy to Debtor's counsel-

> Ballard Spahr LLP
> 1225 17th Street
> Suite 2300
> Denver, Colorado 80202
> Attention:    Carl Eklund
>                     James Bickford
> Facsimile:    (303) 296-3956

      11.    <u>Governing Law</u>.  Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of (a) the State of Colorado shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, except as provided otherwise in the Lock-Up Term Sheet and the exhibit thereto, the Lock-Up Agreement and the exhibits thereto, the DIP Documents and any exhibits thereto, and the Exit Facility Documents and any exhibits thereto, all of which are governed by the Laws of the State of New York; and (b) the laws of the Yukon Territory shall govern corporate governance matters with respect to Debtor; in each case without giving effect to the principles of conflicts of law thereof.

12.     Additional Information.  Inquiries regarding information not contained in the Disclosure Statement may be made by contacting counsel for Debtor, Carl A. Eklund and James P. Bickford, via email, at eklundc@ballardspahr.com and bickfordj@ballardspahr.com, respectively.

13.     Exhibits.  All Exhibits are incorporated into and are a part of the Plan as if set forth in full in the Plan.  To the extent any Exhibit is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of the Plan shall control.

### EXHIBITS

1.     Debtor's Plan of Liquidation

       Sch. 1: Assumed Executory Contracts and Unexpired Leases

       Sch. 2: Cure Amounts

       Ex. A: Lock-Up Term Sheet (and Ex. A thereto)

       Ex. B: Lock-Up Agreement (and Exs. A-F thereto)

       Ex. C: DIP Facility

       Ex. D: Exit Facility Term Sheet

2.     Order Approving the Adequacy of the Disclosure Statement

3.     Most Recent Monthly Operating Report

4.     Scheduled Creditors Holding Class 1 Convenience Claims

5.     Scheduled Creditors Holding Class 2 General Unsecured Claims

*[Remainder of Page Intentionally Left Blank]*

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth above, Debtor believes that the confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, Debtor urges all Holders of Class 1 and Class 2 claims and Holders of Class 3 Equity Interests to vote to ACCEPT the Plan, and to complete and return their Ballots so that the Ballots will be RECEIVED by **5 p.m. (Mountain)** on **December 3, 2009**.

DATED this 4th day of November, 2009.

By:     \s\ Tom Beardmore-Gray
Name: Tom Beardmore-Gray
Title:   President and Chief Executive Officer

BALLARD SPAHR LLP

Carl A. Eklund, #2299
James P. Bickford #40065
1225 17th Street, Suite 2300
Denver, Colorado 80202
Tel. (303) 292-2400
Fax: (303) 296-3956
eklundc@ballardspahr.com
bickfordj@ballardspahr.com

Attorneys for Archangel Diamond Corporation